268 P.3d 370

SCENIC ARIZONA, an Arizona corpora-
tion; Neighborhood Coalition of Greater
Phoenix, an Arizona corporation, Plain-
tiffs/Appellants/Cross–Appellees,

v.

CITY OF PHOENIX BOARD OF
ADJUSTMENT, a municipal
agency, Defendant/Appellee,

American Outdoor Advertising, Inc., an
Arizona corporation, Defendant/Ap-
pellee/Cross–Appellant.

No. 1 CA–CV 09–0489.

Court of Appeals of Arizona,
Division 1, Department B.

Nov. 17, 2011.

As Amended Feb. 9, 2012.

Gammage & Burnham, P.L.C. By Cameron C. Artigue and Carolyn V. Williams, Phoenix, Attorneys for Plaintiffs/Appellants/Cross–Appellees.

Gary Verburg, Office of the City Attorney By L. Michael Hamblin, Phoenix, Attorneys for Defendant/Appellee City of Phoenix.

Shorall McGoldrick Brinkmann, PC By Thomas J. Shorall, Jr. and Asa William Markel, Phoenix, Attorneys for Defendant/Appellee/Cross-Appellant American Outdoor Advertising.

Rogers Towers, P.A., By William D. Brinton, Pro Hac Vice, Jacksonville, FL, Arizona Center for Law in the Public Interest By Joy E. Herr-Cardillo, Tucson, Attorneys for Amicus Curiae The Sierra Club and Scenic America.

Quarles & Brady L.L.P. By Kevin D. Quigley, David E. Funkhouser, III and Sarah R. Anchors, Phoenix, Attorneys for Amicus Curiae Clear Channel Outdoor, Inc.

Thomas C. Horne, Arizona Attorney General By Bryan B. Perry, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Department of Transportation.

## OPINION

BROWN, Judge.

¶ 1 The City of Phoenix Board of Adjustment ("Board") granted a use permit to American Outdoor Advertising, Inc. ("American Outdoor") to operate an electronic billboard adjacent to Interstate 17.[1] The Neighborhood Coalition of Greater Phoenix, along with Scenic Arizona,[2] petitioned for special action in the superior court, asserting

---

1. The billboard at issue is the substantial equivalent of a large digital picture frame. It displays a static color image that changes every eight seconds. The image is produced using matrices of thousands of tiny light emitting diodes ("LEDs"). An LED is "[a] semiconductor diode that converts applied voltage to light." Webster's II New College Dictionary 641 (3d ed. 2005). The images displayed on the screen are programmed remotely through a computer terminal. Using this technology, billboards can "provide dynamic and realistic views much like color television." Federal Highway Administration ("FHWA"), Research Review of Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction (Literature Review), http:// www.fhwa.

dot.gov/realestate/elecbbrd/chap2.html (last visited Oct. 20, 2011).

2. Neighborhood Coalition is a citizen organization whose announced purpose "is to protect, and give a voice" to members "who want to protect and preserve aesthetic, economic, and safety concerns within their neighborhoods." Scenic Arizona is a statewide organization "dedicated to scenic preservation and outdoor advertising control" that endeavors to "give a voice to citizens and members who are concerned by traffic safety and its interplay with aesthetic regulation." Except as otherwise noted, we refer to both organizations collectively as "Scenic."

the billboard would violate Arizona Revised Statutes ("A.R.S.") section 28–7903 (1998),[3] a provision of the Arizona Highway Beautification Act ("AHBA"). The court determined that Scenic had standing to challenge the Board's decision, but denied the petition on its merits, finding the Board did not act in excess of its authority. For the following reasons, we affirm the court's decision as to standing, but reverse on the merits because the billboard's intermittent lighting is not allowed under the AHBA.

## BACKGROUND

¶ 2 In early 2008, American Outdoor submitted an "application for zoning adjustment" to the City requesting a use permit to allow an "electronic message board" on an existing billboard.[4] A zoning adjustment hearing officer initially considered the application and approved the billboard subject to several conditions, including a maximum brightness level, a minimum display time of eight seconds for each image, extinguishment of all illumination from 11:00 p.m. until sunrise, and a prohibition against any animation or any "flashing, blinking, or moving lights."

¶ 3 Scenic appealed the hearing officer's decision to the Board, asserting in part that the billboard would use "intermittent light" in violation of the AHBA. At the hearing before the Board, Scenic's representatives presented testimony outlining their opposition to the use permit for the reasons previously addressed in their appeal letter and accompanying exhibits. American Outdoor's representative responded that the billboard's changing light display was nothing more than a "change of copy" and that a letter from the Arizona Department of Transportation ("ADOT") to the City's zoning administrator indicated ADOT's approval of the proposed use. American Outdoor also referenced a favorable ruling by an administrative law judge ("ALJ") in an ADOT enforcement action and a Federal Highway Administration ("FHWA") guidance memorandum that purportedly approved electronic billboards.

¶ 4 Following the hearing, the Board upheld the hearing officer's decision to grant the permit, finding that the billboard would "be in compliance with all provisions of the [city] ordinance and other laws." Scenic then petitioned for special action relief in the superior court pursuant to A.R.S. § 9–462.06(K) (2008), naming the Board and American Outdoor (collectively "American Outdoor") as defendants. Scenic alleged that the Board's decision violated the AHBA and therefore the Board acted in excess of its authority. American Outdoor moved to dismiss for lack of standing. Scenic's subsequent motion to amend the complaint was unopposed. After Scenic filed its amended complaint, American Outdoor again moved to dismiss for lack of standing. The court denied the motion, but subsequently denied the relief Scenic requested. Scenic appealed and American Outdoor cross-appealed the court's ruling on standing.

## DISCUSSION [5]

### I. Scenic Qualifies as a "Person Aggrieved" Under the Municipal Board of Adjustment Statute.

¶ 5 American Outdoor asserts that Scenic's members are not "aggrieved" by the Board's decision, and that if individual members do not have standing, Scenic cannot sue on their behalf.[6] In reviewing a trial court's

3. We cite the current statutes when there have been no relevant changes.

4. This type of outdoor advertising is also referred to as an "off-premises changeable electronic variable message sign" or a "digital changing video display." For convenience, we refer to the message board at issue here as "the billboard," and to these types of outdoor advertising devices generally as digital billboards or electronic billboards.

5. On appeal, the Board filed a separate answering brief addressing the merits of the special action. Because the Board's arguments closely parallel American Outdoor's arguments, we need not separately address the Board's position.

6. For convenience, and consistent with the terminology used by the parties, we frame this issue generally as whether Scenic has "standing" to challenge the Board's decision in superior court. The more accurate question, however, is whether Scenic qualifies as a "person aggrieved" under A.R.S. § 9–462.06(K) within the context of the AHBA. See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (quoting 5 U.S.C. § 702

denial of a motion to dismiss, "we consider the facts alleged in the complaint to be true ... and determine whether the complaint, construed in a light most favorable to the plaintiff, sufficiently sets forth a valid claim." *Douglas v. Governing Bd. of the Window Rock Consol. Sch. Dist. No. 8*, 206 Ariz. 344, 346, ¶ 4, 78 P.3d 1065, 1067 (App.2003) (internal quotations and citations omitted); *see also Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

¶ 6 In its amended complaint, Scenic alleged as follows: (1) its members use, and intend to continue using, the streets and highways within view of the billboard and the billboard affects their aesthetic enjoyment; (2) the billboard creates an increased safety risk to its members by distracting them and other drivers on the road and thereby increases the risk of traffic accidents; and (3) its members face longer drive times and increased fuel consumption if they choose to alter their routes to avoid the billboard.[7] American Outdoor contends that these allegations are conclusory and thus "not entitled to be accepted as true." Although broadly stated, Scenic's amended complaint does include material factual allegations relating to the harm its members have suffered; therefore, we presume the allegations are true. *Cf. Aldabbagh v. Ariz. Dept. of Liquor Licenses and Control*, 162 Ariz. 415, 417, 783 P.2d 1207, 1209 (App.1989) (When reviewing a motion to dismiss, "the well-pleaded material allegations of the complaint are taken as admitted, but conclusions of law or unwarranted deductions of fact are not.").

¶ 7 If a statute authorizes judicial review of an administrative decision, deciding whether a plaintiff has standing "must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The pertinent statute here is A.R.S. § 9–462.06(K), which provides that a "person aggrieved" by a decision of the Board may file a special action in superior court seeking review of the decision. The statute provides further that a "taxpayer, officer or department of the municipality affected by a decision" of the Board also may seek judicial review. Thus, Scenic must demonstrate that under those provisions at least one of its members is "aggrieved" by the decision of the Board, which is an issue we review de novo. *See Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs.*, 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985) (noting that representational standing may be based on members of the organization having "standing to sue in their own right"); *Center Bay Gardens v. City of Tempe*, 214 Ariz. 353, 356, ¶ 15, 153 P.3d 374, 377 (App.2007) ("Unless there are fact issues that require resolution, whether a party has standing to sue is a question of law, which we review de novo."). Additionally, this type of statute is "remedial and must be construed liberally to promote the ends of justice." *See City of Scottsdale v. McDowell Mountain Irr. & Drainage Dist.*, 107 Ariz. 117, 121, 483 P.2d 532, 536 (1971) (considering whether appellants qualified as "any person affected" under A.R.S. § 45–1522, which provides a judicial remedy for challenging the organization of an irrigation district).

¶ 8 No prior reported case has squarely addressed the meaning of "person aggrieved" within the context of § 9–462.06(K), particularly under the circumstances presented here, where the plaintiff seeks judicial review of the Board's approval of a hearing officer's grant of a use permit for operation of an electronic billboard. Our legislature has given the Board the duty to hear and decide appeals from decisions made by the zoning administrator, such as the grant or denial of variances, the issuance of use permits, or the interpretation of a zoning ordinance. *Austin*

---

(1964 ed., Supp. IV)) ("[T]he Administrative Procedure Act grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'").

7. Scenic did not allege that any of its members are "taxpayers" within the meaning of § 9–462.06(K). *See* discussion *infra* ¶¶ 7, 10.

*Shea (Arizona) 7th St. & Van Buren, L.L.C. v. City of Phoenix*, 213 Ariz. 385, 390, ¶ 21, 142 P.3d 693, 698 (App.2006) (citing A.R.S. § 9–462.06(C)). In resolving matters before it, the Board may receive evidence and take testimony from witnesses who are placed under oath. *Id.* Thus, the Board acts in a "quasi-judicial" capacity. *Id.* (citing *Lane v. City of Phoenix*, 169 Ariz. 37, 41, 816 P.2d 934, 938 (App.1991)). Additionally, "[t]he Board must act in accordance with the law or it is without jurisdiction." *Arkules v. Bd. of Adjustment*, 151 Ariz. 438, 440, 728 P.2d 657, 659 (App.1986).

¶ 9 The statute does not define "person aggrieved," but we are able to discern from its use in § 9–462.06(K) that the legislature intended to permit much broader standing in this context than in other proceedings.[8] When the legislature has intended to impose more stringent standing requirements, it has used different language than what it included in the statute here. *See P.F. West, Inc. v. Superior Court*, 139 Ariz. 31, 33–34, 676 P.2d 665, 667–68 (App.1984) (construing A.R.S. § 11–808(D), which permits a judicial challenge to a county board of adjustment decision only by an "adjacent or neighboring property owner who is specially damaged," and finding no such restrictive language in statute allowing appeal to a county board of adjustment); *see also Mendelsohn*, 76 Ariz. at 169, 261 P.2d at 988 ("Instead of these more specific terms, the legislature chose the phrase 'the person aggrieved', which has a broader signification.... Had the legislature meant to limit the right to [appeal to] one of the two parties it could have used, and doubtless would have used, a more limited term.").

¶ 10 In contrast, the plain language of § 9–462.06(K) does not limit standing to ad-jacent property owners, nor does it restrict potential challengers to those who are parties to a zoning or adjustment proceeding. *See Mail Boxes, Etc., U.S.A. v. Indus. Comm'n*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995) (recognizing that courts look first to language of the statute to determine legislative intent). Even within the context of the municipal board of adjustment statutes, the legislature chose to differentiate between the standing requirements. Under § 9–462.06(D), an appeal *to the board* may be taken by "persons aggrieved or by any officer, department, board or bureau of the municipality affected by a decision of the zoning administrator...." A challenge *in superior court*, however, may be filed by a "person aggrieved" or by a "taxpayer." A.R.S § 9–462.06(K). The legislature plainly intended that standing to challenge a board decision in superior court would be easier to establish than an appeal to the board of adjustment; otherwise, the legislature would not have included the "taxpayer" category. *See P.F. West*, 139 Ariz. at 34, 676 P.2d at 668 ("Since these statutes were enacted together, we must assume that the legislature intended different consequences to flow from the use of different language in these three subsections.").

¶ 11 We are also guided by the principle that deciding whether a person is aggrieved necessarily involves examining the legal basis of the claimed injury. *See McDowell Mountain*, 107 Ariz. at 121, 483 P.2d at 536 (quoting *Camp*, 397 U.S. at 153, 90 S.Ct. 827) (applying the United States Supreme Court's definition of standing as "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute"); *Town of Paradise Valley v. Gulf Leisure*

---

8. "Aggrieved" means "having legal rights that are adversely affected." Blacks Law Dictionary 73 (8th ed. 2004). As our supreme court has observed, the term "person aggrieved" must be considered in the context in which it is used. *Mendelsohn v. Superior Court*, 76 Ariz. 163, 166, 261 P.2d 983, 986 (1953) ("We find that whether the legislature has given [petitioners] the right to appeal cannot be determined by looking only to the phrase 'the person aggrieved'. Our exhaustive examination of the law and cases in Words and Phrases 'Aggrieved' and 'Person Aggrieved',

Corpus Juris Secundum 'Aggrieved', and Black's Law Dictionary, 3rd ed., 'Aggrieved Party', served to remind us of what Humpty Dumpty told Alice—'When *I* use a word, it means just what I choose it to mean—neither more nor less.' Chapter Six, Through the Looking Glass, Charles Dodgson.... Accordingly, the question of whether these [petitioners] have the right to appeal must be bottomed on something more substantial than a pedantic construction of two adjectives and one noun.").

*Corp.*, 27 Ariz.App. 600, 606–07, 557 P.2d 532, 538–39 (1976) (same). The AHBA was adopted to promote "the reasonable, orderly, and effective display of outdoor advertising," while also promoting "the safety and recreational value of public travel and [preserving] natural beauty." *See* Arizona–Federal Agreement, November 18, 1971; 23 U.S.C. § 131(a) (2010); *infra* ¶ 29.

¶ 12 Additionally, whether a particular plaintiff can establish standing to challenge a use permit for a billboard involves unique considerations that may not be present in other land use contexts. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("[S]igns take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation."); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (noting safety and aesthetic concerns related to billboard advertising); *Ballen v. City of Redmond*, 466 F.3d 736, 744 (9th Cir.2006) ("The externalities of billboards include perdurable[9] visual pollution that pervades a substantial volume of our eyesight and grows into an unignorable part of our cultural landscape."). Unlike an apartment building, trailer park, or retail supercenter, a billboard exists for the purpose of capturing the attention of highway drivers. The intended use of a billboard such as that at issue here has little or nothing to do with the land on which it sits. Thus, the potential impact of a particular billboard on a person who operates a vehicle on the highway is highly relevant in determining whether that individual has been adversely affected within the context of the AHBA.

▮ ¶ 13 Based on the foregoing, Scenic was required to allege sufficient facts to establish that the interests of its members would be adversely affected by the decision of the Board. Scenic was therefore obligated to allege specific harm that legitimately falls within the zone of interests the AHBA was intended to protect. Scenic alleged that the billboard would affect the aesthetic enjoyment of its members, create an increased safety risk, and cause longer drive times and increased fuel consumption. The essence of these allegations is the claimed interference with the proper use and enjoyment of one of the highways of this state, which are interests within the scope of the AHBA. *See* A.R.S. §§ 28–7901 to –7915 (1998, Supp. 2010); *see also Camp*, 397 U.S. at 153–54, 90 S.Ct. 827 (recognizing that the interest of an aggrieved person within the meaning of a relevant statute "may reflect aesthetic, conservational, and recreational as well as economic values") (internal quotations and citation omitted).[10]

▮ ¶ 14 Our conclusion does not conflict with well-established principles of standing involving other land use challenges that typically do not involve a specific statutory appeal procedure. In those cases, a plaintiff generally must satisfy judicially-established requirements to show (1) "particularized harm resulting from the decision[,]" (2) "an injury in fact, economic or otherwise[,]" and (3) the "damage alleged [is] peculiar to the plaintiff or at least more substantial than that suffered by the community at large." *Center Bay Gardens*, 214 Ariz. at 358, ¶ 20, 153 P.3d at 379 (internal quotations and citations omitted). Our opinions in these other cases have generally focused on proximity to the proposed use and the impact the use will have on the plaintiff and the immediately surrounding neighborhood. *See, e.g., Blanchard v. Show Low Planning and Zoning Comm'n*, 196 Ariz. 114, 118, ¶¶ 21, 24, 993 P.2d 1078, 1082 (App.1999) (finding that proximity made it sufficiently likely that traffic, litter, drainage, and noise from the proposed project would significantly affect plaintiff's property); *Buckelew v. Town of Parker*,

9. Perdurable means "extremely durable" or "permanent." Webster's II New College Dictionary 836 (3d ed. 2005).

10. American Outdoor relies on *Spahn v. Zoning Bd. of Adjustment*, 602 Pa. 83, 977 A.2d 1132, 1152 (2009), asserting that civic organizations do not have standing to challenge a zoning board of adjustment decision. *Spahn*, however, is not persuasive here. It merely stands for the proposition that the legislature may limit who has the right to challenge a zoning decision. *See id.* (finding state law imposed more strict requirements than the city's ordinance).

188 Ariz. 446, 449, 452, 937 P.2d 368, 371, 374 (App.1996) (finding standing based on allegations of property damage to plaintiff's property, noise, littering, threats of violence, increased criminal activity, and the destruction of personal property by tenants on adjacent property); *Center Bay Gardens*, 214 Ariz. at 360, ¶ 26, 153 P.3d at 381 (concluding that a proposed development project would harm plaintiffs' property because it would be across the street and would nearly triple the living density in the area and fail to abide by previously required landscape set-offs).[11]

█ ¶ 15 Such cases stand on the well-established principle that when challenging a governing board's zoning decision, a plaintiff must allege particularized injury to his or her *own property*. *See, e.g., Blanchard*, 196 Ariz. at 118, ¶ 24, 993 P.2d at 1082. It is clear to us that proximity to one's own property is much less relevant to the question of standing in the context of a challenge to a billboard along a highway, which by law may be located only in commercial or industrial areas. *See* A.R.S. § 28–7902(A) (Supp.2010); FHWA, A History and Overview, http://www.fhwa.dot.gov/realestate/oacprog.html# TERMS (last visited Oct. 20, 2011) ("The objective of the [Federal] Highway Beautification Program legislation was to limit billboards to areas of similar land use.... In so doing, the areas not having commercial and industrial areas would be protected from the intrusion of off-premise[s] outdoor advertising signs."). We reject American Outdoor's effort to characterize the issue of standing here as one based on proximity and proof of damage to property. Nothing in the language of § 9–462.06(K) suggests that the legislature intended that

the "person aggrieved" would be required to prove damages to real property he or she owned in close proximity to the offending land use.

¶ 16 In sum, the plain language of the board of adjustment statute is expansive, which means the legislature intended to allow substantial public input and challenge. *Cf. Mendelsohn*, 76 Ariz. at 170, 261 P.2d at 989 ("Unquestionably, our liquor legislation envisages participation by the general public in the administration of the liquor laws.... The persons upon whose doorsteps the liquor business will operate, and whose businesses, homes, and families will be affected thereby, are given the same rights as those who seek to engage in the liquor traffic."); *Center Bay Gardens*, 214 Ariz. at 360, ¶ 29, n. 9, 153 P.3d at 381, n. 9 (stating that "parties are not prevented from asserting 'selfish' interests in opposition to zoning decisions, nor are boards of adjustment precluded from considering such interests"). Additionally, the injuries alleged here fall within the zone of interests the AHBA was intended to protect—the safety and aesthetics of Arizona's highways. Finally, restricting standing to only those neighboring property owners who experience injuries to their own properties would make highway billboards, which are restricted to commercial and industrial areas, virtually immune from judicial review. Although the absence of any appropriate plaintiff is not a valid reason for granting standing,[12] it is a relevant consideration when, as here, the injuries alleged by plaintiffs fall within the broad parameters of § 9–462.06(K) and the established purposes of the Federal Highway Beautification Act ("FHBA") and the AHBA. Because Scenic has satisfied the "person ag-

**11.** Of the various reported land use decisions in Arizona, only *Buckelew* involved the statutory right to judicially challenge a board of adjustment decision under § 9–462.06(K). But we did not address the "person aggrieved" standard in *Buckelew;* instead, we found the plaintiff had standing based on the specific damages to his residence, which was located adjacent to the offending use. 188 Ariz. at 452, 937 P.2d at 374. In *Center Bay Gardens*, we referenced § 9–462.06(K) in a footnote, stating that "[w]e do not consider the 'aggrieved person' standard to create a substantially different test than that set forth in *Buckelew, Blanchard*, and the related cases." 214 Ariz. at 358, ¶ 20, n. 7, 153 P.3d at

379, n. 7. However, *Center Bay Gardens* involved a challenge to a decision of the Tempe City Council to grant several variances from its zoning ordinance. *Id.* at 354–55, ¶¶ 3–5, 153 P.3d at 375–76. It did not involve a challenge to the decision of the board of adjustment under § 9–462.06(K), and thus the statement in the footnote is dictum.

**12.** *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.")

grieved" requirement under § 9–462.06(K), we agree with the superior court's determination that Scenic has standing to challenge the use permit.

## II. The Use Permit Violates the Arizona Highway Beautification Act.

¶ 17 The AHBA, under the section titled "Outdoor Advertising Prohibited," provides in pertinent part as follows:

> Outdoor advertising shall not be placed or maintained adjacent to the interstate, secondary or primary systems at the following locations or positions, under any of the following conditions or if the outdoor advertising is of the following nature:
>
> . . .
>
> 4. *If it is visible from the main traveled way and displays a red, flashing, blinking, intermittent or moving light or lights likely to be mistaken for a warning or danger signal,* except that part necessary to give public service information such as time, date, weather, temperature or similar information.[13]
>
> . . .
>
> 5. If an illumination on the outdoor advertising is of such brilliance and in such a position as to blind or dazzle the vision of travelers on the main traveled way.

A.R.S. § 28–7903(A) (1998) (emphasis added).

¶ 18 The issues we must resolve are whether the billboard displays intermittent lighting, and if it does, whether such lighting violates the AHBA. Because resolution of these issues is based on statutory interpretation, our review of the Board's legal determination is de novo. *See Pingitore v. Town of Cave Creek,* 194 Ariz. 261, 264, ¶ 18, 981 P.2d 129, 132 (App.1998).

¶ 19 We note at the outset the complexity of this task. The technology that allows digital images to be displayed on billboards using internal lighting directed from a remote location was not in existence until long after the AHBA was adopted. Neither the statute nor the related administrative regulations define "intermittent," and ADOT's informal positions and interpretations on the topic have recently changed. Similarly, efforts by the FHWA to provide guidance to the states as to whether federal law allows digital billboards are largely unhelpful to our analysis. Furthermore, two legislative attempts within the last decade to change the AHBA to specifically allow digital billboards have failed. With those factors in mind, we analyze whether the billboard proposed by American Outdoor complies with Arizona law.

¶ 20 When construing a statute, our goal is to find and give effect to legislative intent. *Mail Boxes, Etc.,* 181 Ariz. at 121, 888 P.2d at 779. We look first to the plain language of the statute as the best indication of the legislature's intent. *Id.* "Each word, phrase, and sentence must be given meaning so that no part will be [void], inert, redundant, or trivial." *City of Phoenix v. Yates,* 69 Ariz. 68, 72, 208 P.2d 1147, 1149 (1949). Although a statute's language must be consulted first, uncertainty about the meaning of the statute's terms requires us to apply "methods of statutory interpretation that go beyond the statute's literal language." *Estancia Dev. Assocs., L.L.C. v. City of Scottsdale,* 196 Ariz. 87, 90, ¶ 11, 993 P.2d 1051, 1054 (App.1999). These methods must include "consideration of the statute's context, language, subject matter, historical background, effects and consequences, and spirit and purpose," *id.,* as well as "the evil sought to be remedied." *McElhaney Cattle Co. v. Smith,* 132 Ariz. 286, 290, 645 P.2d 801, 805 (1982).

### A. The Billboard Uses Intermittent Lighting.

¶ 21 American Outdoor suggests that its billboard does not display "intermittent" lighting within the meaning of the AHBA because its LED lighting is "constant" and the display merely changes "copy" every eight seconds. We disagree. The lighting is

---

**13.** These prohibitions apply only to "off-premises advertising." *See* A.R.S. § 28–7902(A)(2) (Supp. 2010) (providing an exception for "[s]igns, displays and devices that are located *on the premises* of the activity that they advertise") (emphasis added). It is undisputed that the billboard at issue here constitutes off-premises advertising and is therefore subject to the AHBA lighting restrictions.

not "constant," as counsel for American Outdoor essentially conceded at oral argument. Counsel agreed that because black light does not exist, any time the color black is part of an LED image, some of the LED lights have been turned off. Furthermore, asserting that the continuous transitions of brightly lit images on the billboard are changes of "copy" ignores reality. What American Outdoor calls a change of "copy" is actually a transition from one lighted image to the next lighted image. In this context, "copy" means a lighted image; therefore, a change of "copy" means a change of lighted image. One cannot be separated from the other.

¶ 22 Consistent with the ordinary meaning of intermittent, defined as "[s]tarting and stopping at intervals ... occasional, periodic, sporadic," Webster's II New College Dictionary 593 (3d ed. 2005), any "intermittent" light is constant until the point that it changes, which of course creates the intermittency. *See Airport Props. v. Maricopa County*, 195 Ariz. 89, 99, ¶ 36, 985 P.2d 574, 584 (App.1999) (stating we may turn to "recognized, authoritative dictionaries ... [for] the ordinary meanings of words contained in statutory provisions"). Because the combination of LEDs used to display each brightly lit image on the billboard changes every eight seconds, the billboard's lighting necessarily is intermittent under the plain meaning of the statute. Thus, we are not persuaded by American Outdoor's attempt to exempt its billboard from the bar on intermittent lighting. The billboard uses multiple arrangements of lighting to display images that stop and start at regular intervals, which means it uses intermittent lighting.

¶ 23 Our conclusion is supported by the City's position that the proposed billboard would utilize intermittent lighting; indeed, that was the reason the billboard required a permit. *See* Phoenix City Ordinance ("Phx. Ord.") § 705.2(A)(19) ("Intermittent or flashing illumination or animation may be permitted subject to a use permit."). The City wrote a letter in October 2007, apparently in response to an inquiry about digital billboards, in which the City's planning director described intermittent lighting as "stopping and starting at regular intervals" and observed that an electronic message board that changed "every so many seconds" would meet the definition of intermittent. At the board of adjustment hearing, the zoning administrator attempted to clarify the prior letter, stating that the City only required American Outdoor to apply for a use permit because the billboard would involve a change of "copy." Her explanation fails, however, because nothing in the City Code requires a use permit for a change in "copy." Indeed, it would be absurd if a sign company were required to seek a use permit each time it desired to change the copy on a traditional billboard by painting a new advertisement or installing a new canvas, a point recognized in the City Code. *See* Phx. Ord. § 705(B)(2)(n) (stating there is no permit required for "[c]hanging copy on a legal sign"); Phx. Ord. § 705.2(A)(19). Additionally, in response to a Board member's question requesting legal advice, the deputy city attorney present at the Board hearing acknowledged the billboard's lighting could be considered intermittent for purposes of state law.[14] Thus, while it is possible that under the City Code "intermittent" means something different from the AHBA, the record does not reveal any legislative action taken by the City to define or clarify "intermittent." Furthermore, the City is not permitted to adopt standards that are less strict than the AHBA. *See* A.R.S. § 28–7912(B) (1998) ("Cities, towns or counties shall not assume control of advertising under this section if the ordinance is less restrictive than this article.").[15]

---

14. The attorney added, however, that he believed the state prohibition on intermittent lighting applied only to lights that were "likely to be mistaken for a warning or danger signal." *See* discussion *infra* II.C.

15. Local zoning authorities are not preempted from enforcing outdoor advertising ordinances as long as the local law is at least as restrictive as the AHBA. *Libra Group, Inc. v. State of Arizona,* 167 Ariz. 176, 181, 805 P.2d 409, 414 (1991) ("We find that the reference to 'lawfully placed' includes local law, if any exists, as the act also recognizes county and municipal authority to issue permits for outdoor advertising signs in its permitting provision."). Phoenix zoning ordinances authorize the issuance of a use permit if the proposed use "[w]ill be in compliance with all provisions of this ordinance and the laws of the City of Phoenix, Maricopa County (if applica-

¶ 24 In sum, we reject American Outdoor's position that its billboard does not display intermittent lighting. Because the combination of lights used to display various images on the billboard changes at periodic intervals, they are intermittent under the plain meaning of the statute.

**B. Intermittent Lighting of Billboards in Arizona Has Not Been Approved by the FHWA, the Arizona Legislature, or ADOT.**

¶ 25 Alternatively, American Outdoor asserts that even if the lighting on its billboard may be intermittent, the billboard does not violate state law because the images it displays change only every eight seconds. American Outdoor's argument assumes that notwithstanding the plain language of the statute, it must allow for *some* intermittent lighting. American Outdoor asserts that federal administrators and other state and city governments have agreed that billboards whose digital images change no more frequently than every eight seconds are permitted, and argues that its billboard's lighting does not violate the AHBA because those regulators have said so. Resolving this argument requires us to review the pertinent history and purpose of the AHBA. *See Carrow Co. v. Lusby,* 167 Ariz. 18, 20, 804 P.2d 747, 749 (1990) ("Legislative intent often can be discovered by examining the development of a particular statute.").

**1. Federal Highway Beautification Act**

¶ 26 The federal government, concerned about the unregulated placement of billboards along interstate highways, adopted the Federal–Aid Highway Act of 1958 ("Bonus Act"). Pub. L. No. 85–381, 72 Stat. 89 (expired June 30, 1965); *see also* FHWA, A History and Overview, Federal–Aid Highway Act of 1958, http://www.fhwa.dot.gov/realestate/oacprog.htm# ACT1958 (last visited Oct. 20, 2011). If states agreed to prohibit billboards within 660 feet of highways in areas not zoned either industrial or commercial, the original legislation authorized bonus payments from the federal government of one-half of one percent of the highway construction costs. 23 C.F.R. 750.101; *see Covenant Media of Ill., L.L.C. v. City of Des Plaines, Ill.,* 496 F.Supp.2d 960, 962, n. 2 (N.D.Ill.2007) (explaining the Bonus Act).

¶ 27 In 1965, Congress enacted the FHBA to regulate outdoor advertising signs adjacent to highways. *Libra,* 167 Ariz. at 178, 805 P.2d at 411 (citing Pub. L. No. 89–285, 79 Stat. 1028 (1965) (codified at 23 U.S.C. § 131)). The purpose of the FHBA is to "protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. § 131(a) (2002). The FHBA mandates that a state that fails to provide "effective control" of specified advertising signs along interstate and primary highway systems faces a penalty of a ten-percent reduction of its share of federal highway funds. *Libra,* 167 Ariz. at 178, 805 P.2d at 411 (citing 23 U.S.C. § 131(b)). In accordance with the FHBA, most states, including Arizona, adopted statutes to provide "effective control" of advertising signs along federally-funded highways. The FHBA includes "certain standards for 'effective control,' and provides that each state and the Secretary of Transportation may enter into an agreement for the erection and maintenance of certain signs adjacent to a highway within industrial or commercial areas." *Id.* (citing 23 U.S.C. § 131(d)).

¶ 28 A 1968 amendment to the Act added a provision requiring the Secretary of Transportation to accept state and local determinations of "customary use" with regard to size, lighting, and spacing of signs in commercial and industrial areas. Highway Appropriation Act, Pub. L. No. 90–495, § 6(a), 82 Stat. 815 (1968). A 1978 amendment applicable to Bonus states allowed signs advertising activities conducted on the same property, or on-

ble), State of Arizona, or the United States." Phx. Ord. § 307(A)(7)(b) (amended on Jan. 19, 2011, by Ord. No. G–5584, to read "Will be in compliance with all provisions of this ordinance and the laws of the City of Phoenix."). Therefore, the use permit issued to American Outdoor

cannot be upheld if it was issued in contravention of a City ordinance, or a state or federal law. *Cf.* A.A.C. R17–3–701(A)(1)(d) (" 'Illegal sign' means one which was erected and/or maintained in violation of the state law.").

premises signs, to change messages at reasonable intervals by electronic process or remote control. Surface Transportation Assistance Act of 1978, Pub. L. No. 95–599, § 122, 92 Stat. 2689 (1978). The clear congressional intent, however, was that this change did not apply to off-premises billboards. *See* 124 Cong. Rec. 26,917–18 (1978), 1978 U.S.C.C.A.N. 6575.[16]

## 2. AHBA/Arizona–Federal Agreement

¶ 29 In 1970, the Arizona Legislature adopted the AHBA, which contains provisions regulating outdoor advertising within 660 feet of the edge of the right-of-way along highways. *Libra*, 167 Ariz. at 178, 805 P.2d at 411 (citing 1970 Ariz. Sess. Laws, ch. 214, § 1 (2nd Reg. Sess.) (codified at A.R.S. §§ 18–711 to –720, repealed by 1973 Ariz. Sess. Laws, ch. 146, § 85 (1st Reg. Sess.))). "It is undisputed that the [AHBA] was adopted to comply with the terms of the [FHBA], in order that Arizona would receive its full share of federal highway funds." *Id.* at 180, 805 P.2d at 413. The AHBA also directed the State Highway Commission to enter into an agreement with the United States Secretary of Transportation. 1970 Ariz. Sess. Laws, ch. 214, § 1 (2nd Reg. Sess.) (formerly codified at A.R.S. § 18–716 (1970), currently codified at A.R.S. § 28–7907 (1998)). The legislative history contains no relevant information relating to the issues presented here, as it simply references the authority of the Commission "to acquire strips of land adjacent to highways for 'beautification purposes.'" Minutes of Ariz. H. Comm. Natural Res. on H.B. 195, 29th Leg., 2nd Reg. Sess. (Mar. 31, 1970).

¶ 30 The Arizona–Federal Agreement ("Agreement") was signed on November 18, 1971, and is almost identical to the current language of the AHBA. A.R.S. § 18–713(A)(5) (1970). The Agreement recites that its purpose is to "promote the reasonable, orderly, and effective display of outdoor advertising while remaining consistent with the national policy to protect the public investment[,] ... to promote the safety and recreational value of public travel and to preserve natural beauty." Arizona–Federal Agreement, November 18, 1971.

## 3. FHWA Guidance Memorandum

¶ 31 In support of its argument that we should construe the Arizona statute to allow digital images that change no more frequently than every eight seconds because regulators elsewhere have allowed such billboards, American Outdoor relies on a 2007 guidance memorandum issued by an FHWA Associate Administrator for Planning, Environment, and Realty. *See* Guidance Memorandum from FHWA to Div. Adm'rs (Sept. 25, 2007). The memorandum was written to "Division Administrators" and explained at the outset that pursuant to 23 C.F.R. 750.705, a state department of transportation must obtain FHWA approval of "any changes to its laws, regulations, and procedures to implement the requirements of its outdoor advertising control program." The memorandum then stated that "[p]roposed laws, regulations, and procedures" that would allow digital billboards subject to "acceptable criteria ... do not violate a prohibition against 'intermittent,' or 'flashing' or 'moving' lights as those terms are used in the various [federal-state agreements]" ("FSAs").[17] That statement was followed by the comment that "all of the requirements in the [FHBA] and its implementing regulations, and the specific provisions of the FSAs, continue to apply." Recognizing that many technological advances had occurred since the FSAs were entered into with the states, the memorandum then explained that digital billboards are acceptable "if found to be consistent with the FSA and with acceptable and approved State regulations, policies and procedures." Division administrators were instructed to consider all relevant information submitted

---

**16.** More background on federal outdoor advertising requirements is available from the Federal Highway Administration website. FHWA, A History and Overview, The Outdoor Advertising Control Program, http://www.fhwa.dot.gov/realestate/oacprog.html# OACP (last visited Oct. 20, 2011).

**17.** The FHWA identified an acceptable display duration time as being "between 4 and 10 seconds," and stated that "8 seconds is recommended."

by a state for proposed regulation of digital billboards, including duration of message, transition time, brightness, spacing, and location. The division administrators were also (1) told to "confirm that the State provided for appropriate public input, consistent with applicable State law and requirements" and (2) "strongly encouraged to work with their State in its review of their existing FSAs."

¶ 32 Although the FHWA memorandum may indicate the federal agency's willingness to allow a state to permit some intermittent billboard lighting, the only standards, rules, or regulations Arizona has adopted to address electronic billboards are the provisions of the AHBA. Nothing in our record indicates there has been any attempt by ADOT to obtain FHWA approval for any proposed law, regulation, or procedure that would exempt digital billboards from the current state prohibition against intermittent lighting. Similarly, we are unaware of any authority suggesting that a guidance memorandum from the FHWA has binding legal effect on the states, and the memorandum itself includes a disclaimer that it is "not intended to amend applicable legal requirements." In a nutshell, the only purpose of the memorandum was to open the door to individual states to work with the FHWA to find acceptable solutions for allowing digital billboards, in the discretion of each state. The memorandum did not eliminate the AHBA's prohibition of intermittent lighting.

### 4. Interpretations by ADOT

■ ¶ 33 American Outdoor also asserts that we must defer to ADOT's recent interpretation of the AHBA, because it is entitled to great weight. It is true that "[j]udicial deference should be given to agencies charged with the responsibility of carrying out specific legislation, and ordinarily an agency's interpretation of a statute or regulation it implements is given great weight." *U.S. Parking Sys. v. City of Phoenix,* 160 Ariz. 210, 211, 772 P.2d 33, 34 (App.1989)

(citation omitted). But that general rule does not necessarily apply when the agency's interpretation of a particular provision is not longstanding. *See id.* at 212, 772 P.2d at 35; *cf. Kubby v. Hammond,* 68 Ariz. 17, 21, 198 P.2d 134, 137 (1948) (deferring to the agency definition when the word "industrial" had been construed the same way by the agency for seventeen years). Moreover, an "agency's interpretation is not infallible, and courts must remain the final authority on critical questions of statutory construction." *U.S. Parking Sys.,* 160 Ariz. at 211, 772 P.2d at 34.

¶ 34 The only arguably longstanding interpretation by ADOT is its (recently abandoned) position that electronic billboards are prohibited because they display intermittent lighting. In 2004, ADOT commenced an enforcement action to prohibit operation of two digital billboards placed on Interstate 10 and Interstate 17. After a hearing, the ALJ found in favor of the advertising company. Clear Channel Outdoor Advert. Co., 03SGN–094 (Jan. 8, 2004). In a post-hearing brief, ADOT vigorously contested the ALJ's decision, arguing that the billboards used intermittent lighting in violation of the AHBA. The ALJ denied reconsideration and rehearing, and ADOT did not judicially appeal the decision. Additionally, in 2003 and 2005, ADOT's representatives made comments in legislative committee hearings supporting the agency's position that the AHBA as currently drafted does not permit electronic billboards. *See infra* ¶ 48, n.24.

¶ 35 But in a January 2008 letter to the City's zoning administrator regarding proposals by other applicants for use permits for digital billboards, ADOT stated it did "not have any objection to the issuance" of the permits. Without citation to regulation or published policy, the agency declared that "[t]he State's outdoor advertising regulations do not prohibit signs that are capable of changing static copy through electronic means at a reasonable frequency." [18]

18. Two days before the letter was sent, ADOT's employees, including the author of the letter, exchanged emails indicating that ADOT had taken a "hands-off approach" to digital billboards since the 2004 enforcement matter and that the industry had attempted a legislative change. The email exchange further noted that "[b]efore we bring FHWA in on this, we probably need to determine what ADOT's/The State's position is" and suggested the option of obtaining an opinion

¶ 36 In light of these conflicts, prior to oral argument we issued an order requesting ADOT to submit an *amicus curiae* brief addressing (1) its interpretation of A.R.S. § 28–7903(A)(4); (2) the "legal effect" of its January 2008 letter to the City's zoning administrator; and (3) whether ADOT's interpretation of § 28–7903(A)(4) is "consistent with its obligations under A.R.S. §§ 28–7907 and 28–7908." In response, ADOT filed a one-page brief stating that its policy for electronic billboards, as reflected in an attached guidance policy memorandum dated August 4, 2008, is consistent with ADOT's obligations under the AHBA. The ADOT "policy" memorandum provides a brief history of electronic billboards and quotes portions of the 2007 FHWA guidance memorandum, but omits any guidance as to whether electronic billboards violate the AHBA's prohibition against intermittent lighting. The amicus brief explained further that the letter to the City's zoning administrator "has no legal effect" beyond the fact that it correctly stated ADOT's position relating to specific use permits that the City was considering and ADOT's policy regarding electronic billboards.

¶ 37 Contrary to Scenic's assertion, the positions taken by ADOT relating to pending legislation, *see infra* n.24, and the 2004 enforcement proceeding do not constitute the type of longstanding precedent that merits judicial deference to the administrative agency. Similarly, ADOT's January 2008 letter

to the City and its August 2008 "policy" memorandum provide no support for American Outdoor's argument that ADOT has adopted a policy allowing electronic billboards. Even if we could construe these informal actions as policies, they have not been adopted by rule as contemplated by the AHBA or the Administrative Procedures Act ("APA").[19] Thus, the lack of formality and the inconsistency with which ADOT has approached the issue persuade us that ADOT's interpretations of the statute are not entitled to judicial deference. Therefore, we are left with the plain meaning of the statute, which, as discussed *supra* ¶ 22, does not permit digital billboards.

### C. Intermittent Lighting is Not Restricted by the Phrase "Likely to be Mistaken for a Warning or Danger Signal."

¶ 38 American Outdoor next contends the billboard does not violate the AHBA because the statutory provision prohibits only intermittent lights that are likely to be mistaken for a warning or danger signal. *See* A.R.S. § 28–7903(A)(4) (prohibiting off-premises sign "[i]f it is visible from the main traveled way and displays a red, flashing, blinking, intermittent or moving light or lights likely to be mistaken for a warning or danger signal, except that part necessary to give public service information such as time, date, weather, temperature or similar information").[20] Thus, according to American Out-

---

from the attorney general "once we get a sense of what is happening."

19. The AHBA provides in part as follows:
The director shall adopt and enforce rules governing the placing, maintenance and removal of outdoor advertising. The rules shall be consistent with:
1. The public policy of this state to protect the safety and welfare of the traveling public.
2. This article.
3. The terms of the agreement with the United States secretary of transportation pursuant to § 28–7907.
4. The national standards, criteria and regulations promulgated by the United States secretary of transportation pursuant to 23 United States Code § 131.
A.R.S. § 28–7908(A). The APA explains the meaning of a rule:
"Rule" means an agency statement of general applicability that implements, interprets or

prescribes law or policy, or describes the procedure or practice requirements of an agency. Rule includes prescribing fees or the amendment or repeal of a prior rule *but does not include intraagency memoranda* that are not delegation agreements.
A.R.S. § 41–1001(18) (Supp.2010) (emphasis added).

20. In the original version of the statute, there was a comma after "intermittent" and before "moving light." A.R.S. § 18–713 (1970). The comma was removed by legislative act in 1972. Act of Mar. 15, 1972, 1972 Ariz. Sess. Laws 52. Nothing indicates that the legislature intended to change the meaning by removing the comma, and we will not infer that intent absent some indication. *State v. Govorko*, 23 Ariz.App. 380, 384, 533 P.2d 688, 692 (1975) ("Certainly if the legislature intended such a significant change in the breadth of the statute, one would expect a more substantial showing of such intent than the

door, unless an outdoor advertising display has an intermittent light *and* such light is likely to be mistaken for a warning or danger signal, the advertising display is allowed under the statute. Scenic counters that § 28–7903(A)(4) lists different types of prohibited lights, one of which is a light that is likely to be mistaken for a warning or danger signal.

¶ 39 Viewing the plain language of the statute, both parties' interpretations are plausible; however, neither construction gives effect and meaning to each word and phrase. Thus, because the statute is ambiguous, we turn to other recognized methods of statutory construction to attempt to ascertain the intent of the legislature.[21] *See Centric–Jones Co. v. Town of Marana,* 188 Ariz. 464, 468, 937 P.2d 654, 658 (App.1996).

¶ 40 Keeping in mind the historical background of the AHBA, we analyze whether the legislature intended that intermittent lights be prohibited only if they are "likely to be mistaken for a warning or danger signal." *See Calvert v. Farmers Ins. Co. of Ariz.,* 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985) (ascertaining legislative intent based on "words, context, subject matter, and effects and consequences of the statute"). American Outdoor's interpretation of § 28–7903(A)(4) would render superfluous the exception for lighting "necessary to give public service information such as time, date, weather, temperature or similar information." Under American Outdoor's view, the prohibition only applies to lighting that falls within a single category—lighting that is likely to be mistaken for a warning or danger signal. If that were true, however, no need would exist for a specific exception governing lighting for public service information. Instead, any lights that are flashing, blinking, intermittent, or moving, except those likely to be mistaken for a warning or danger signal, would be permitted. But we must strive not to construe statutory schemes in a way that renders any portion of them superfluous, and

therefore we cannot agree with American Outdoor's restrictive interpretation. *See Grand v. Nacchio,* 225 Ariz. 171, 175–76, ¶ 22, 236 P.3d 398, 402–03 (2010) ("We ordinarily do not construe statutes so as to render portions of them superfluous.").

¶ 41 Furthermore, if we were to adopt the statutory construction urged by American Outdoor—that "likely to be mistaken" modifies every other kind of light in that subsection—the result would severely diminish Arizona's "effective control" over billboard lighting. Granted, under American Outdoor's interpretation, the AHBA would still prohibit lights "likely to be mistaken for a warning or danger signal," and lights "of such brilliance and in such a position as to blind or dazzle the vision of travelers on the main traveled way." *See* A.R.S. § 28–7903(A)(4)–(5). But beyond those narrow prohibitions, the lighting options would be unrestricted. For example, the statute would not bar animations or other videos, given that they could hardly be mistaken for a warning or danger signal or rise to the level of blinding brilliance. Similarly, a colorful array of holiday lights could be allowed, even if the lights flash or blink. Flashing floodlights used to light a traditional billboard that could intermittently rotate between light and darkness every few seconds to capture the attention of nighttime drivers might also not be prohibited. Even a light display involving "chasing snakes" would appear to be permissible. *See Ellison Furniture & Carpet Co. v. Langever,* 52 Tex. Civ.App. 50, 113 S.W. 178, 178 (1908) (describing proposed electric sign with the word "Ellison" surrounded by a border consisting of rows of electric lights "so arranged that by a system of intermittent lights the border produced the effect of two snakes chasing each other around the word 'Ellison' ").

¶ 42 These lighting scenarios are entirely inconsistent with the safety and beautification purposes of the AHBA, the FHBA, and

use of a grammatical sleight of hand with commas.'').

**21.** The statute's uncertainty is presumably a natural consequence of the poor wording of the federal legislation on which it is based. As one author observed, "[i]t must be conceded ... that

title I of the Highway Beautification Act is one of the worst-drafted pieces of legislation ever to emerge from the Congress." Roger A. Cunningham, Billboard Control Under the Highway Beautification Act of 1965, 71 Mich. L. Rev. 1295, 1371 (1972–73).

the Agreement, a principle apparently recognized at least in part by ADOT. In its January 2008 letter to the City, ADOT wrote: "The State's outdoor advertising regulations do not prohibit signs that are capable of changing static copy through electronic means at a reasonable frequency. *They do however prohibit electronic signs that display or emulate animation.*" (Emphasis added.) The bifurcated interpretation suggested by American Outdoor and reflected in the ADOT letter demonstrates why it would be plainly contrary to the legislature's intent to adopt American Outdoor's contention that the prohibition in § 28–7903(A)(4) applies only to lighting that is "likely to be mistaken for a warning or danger signal."

¶ 43 To the extent American Outdoor argues that the AHBA's main purpose is safety rather than beautification, that argument also fails. The AHBA must be interpreted in a manner consistent with the Agreement and the FHBA. There is no question that safety considerations are an essential component of the AHBA; however, those provisions do not override the beautification aspect of the legislation. Because the purpose of the statutory scheme was to limit the proliferation of billboards, we are not persuaded by American Outdoor's narrow reading of the lighting provisions of the AHBA. *See South Dakota v. Volpe*, 353 F.Supp. 335, 340 (1973) ("Congress never intended to subvert the [FHBA's] stated purpose to arbitrary actions taken by the individual state legislatures.").

¶ 44 Based on the history and purpose of the statute, we conclude that the most reasonable reading is to follow the statute exactly as it is punctuated. Accordingly we read the statute as barring "a red, flashing, blinking, intermittent or moving light," as well as "lights likely to be mistaken for a warning or danger signal." Thus, a billboard that displays an intermittent light is prohibited without regard to whether the display is likely to be mistaken for a warning or danger signal. Recognizing that the statute is not drafted artfully, this reading adheres most closely to

the legislative history and intent. *See Calvert*, 144 Ariz. at 294, 697 P.2d at 687 (noting "[t]he cardinal rule of statutory interpretation is to determine and give effect to the legislative intent behind the statute"); *State v. Cornish*, 192 Ariz. 533, 537, ¶ 16, 968 P.2d 606, 610 (App.1998) ("Courts will apply constructions that make practical sense rather than hypertechnical constructions that frustrate legislative intent.").[22]

¶ 45 Our conclusion is consistent with the Arizona Legislature's unsuccessful efforts to amend the law twice within the last eight years. In 2003, House Bill 2364 proposed an amendment that would have specifically permitted electronic billboards as long as they displayed a static, non-animated message that changed no more frequently than every six seconds. H.B. 2364, 46th Leg., 1st Reg. Sess. (Ariz. 2003). The proposed legislation passed the House but failed by a roll call vote in a Senate committee. Minutes of Ariz. S. Comm. on Commerce on H.B. 2364, 46th Leg., 1st Reg. Sess. (Apr. 2, 2003).

¶ 46 In 2005, House Bill 2461 proposed adding the following language to the AHBA: " 'Intermittent' means a pattern of changing light intensity, other than that achieved with immediate, fade or dissolve transitions between messages, where any message remains static for less than six seconds." H.B. 2461, 47th Leg., 1st Reg. Sess. (Ariz. 2005). The bill also proposed definitions for "fade" and "dissolve" and would have required a separate permit for digital billboards, along with a mandate that ADOT separately establish and collect fees for those permits. *Id.* Both the House and Senate passed the bill, but the governor vetoed it, pointing to opposition from neighborhood associations and Arizona's major observatories. *See* Letter from Governor Janet Napolitano to Speaker Jim Weiers (May 9, 2005).

¶ 47 Normally, "[r]ejection by the house or senate, or both, of a proposed bill is an unsure and unreliable guide to statutory construction." *City of Flagstaff v. Mangum,*

22. Our interpretation does not purport to resolve all potential issues relating to other types of lighting prohibited by the AHBA. For example, reading the statute as we do here would mean that a billboard using just one "red" light for illumination would be prohibited, a potentially absurd result. However, the type of "red" lights that the statute prohibits is not a question before us.

164 Ariz. 395, 401, 793 P.2d 548, 554 (1990). However, there are limited occasions when such inaction by the legislature can be relevant in determining the intended scope of a statute. *See Long v. Dick,* 87 Ariz. 25, 29, 347 P.2d 581, 583–84 (1959) (explaining that "the members of the legislature were repeatedly made aware of the operation of the statute and must have known its administrative interpretation and application. Yet, no change of any material or substantial nature occurred...."); *Ni v. Slocum,* 196 Cal. App.4th 1636, 127 Cal.Rptr.3d 620, 631 (2011) (construing the legislature's passage of a bill, which the governor later vetoed, directing further study on creation of a digital electoral system as evidence that the legislature did not believe such a system was addressed by existing statutes); *Denver Publ'g Co. v. Bd. of Cnty. Comm'rs of Cnty. of Arapahoe,* 121 P.3d 190, 197 (Colo.2005) (comparing the broad definition of "public record" in failed legislation with the narrower definition included in successful legislation).

¶ 48 Here, the legislative history includes statements made by the advertising industry, opposition groups, and ADOT representatives during the committee hearings.[23] Those statements, together with the legisla-

ture's decision to attempt to adopt legislation, tend to support the legislature's understanding that electronic billboards are barred by existing laws. At a minimum, the legislative history demonstrates that the legislature was aware of ADOT's informal positions in 2003 and 2005 that the AHBA did not allow electronic billboards.[24]

**D. Arizona Has Not Changed the Statutory Prohibition of Intermittent Lighting.**

¶ 49 We recognize that digital billboards are now permitted in many states. But those states have acted legislatively or administratively to formally enact standards, and Arizona has not. Of the states that allow digital billboards, the vast majority do so only by specific statute or regulation that addresses the "intermittent" issue.

¶ 50 For example, in Delaware, the legislature adopted a statute expressly permitting digital billboards and stating they are "not considered to be in violation of flashing, intermittent, or moving lights criteria" if they comply with certain conditions, including a minimum display time of ten seconds, bright-

---

**23.** Scenic points to testimony in 2003 from various entities, including the Arizona Outdoor Advertising Association and ADOT showing that ADOT's interpretation of current statutes meant that an amendment would be necessary to allow digital billboards. Wendy Briggs, representing the Association, testified that ADOT's "interpretation of the existing law is that these boards are not permitted," but it was her contention "that they are already permitted in some instances." Minutes of Ariz. H. Comm. on Commerce and Military Affairs on H.B. 2364, 46th Leg., 1st Reg. Sess. (Feb. 24, 2003). Kevin Biesty, on behalf of ADOT, stated that ADOT believed that Arizona would be out of compliance with federal law, could jeopardize the Agreement, and would stand to lose approximately $65 million in federal funding if the amendment were adopted. He proposed a stakeholder meeting to review "the issue with a view to drafting rules and guidelines in regard to the new technology." *Id.* Blake Custer, for Clear Channel Outdoor, explained he had discussed electronic billboards with the City of Phoenix and "was informed there needed to be a change in the law" before such billboards would be allowed. *Id.* We generally give no weight to comments of non-legislators at committee hearings to ascertain the intent of the legislature. *Hayes v. Cont'l Ins. Co.,* 178 Ariz. 264, 270, 872 P.2d 668, 674 (1994). However,

these statements indicate the uncertain status of whether digital billboards were permissible when this legislation was proposed.

In 2005, a representative of Young Electric Sign Company spoke in support of the proposed amendment, stating it would be a clarification of the original language. Minutes of Ariz. H. Comm. on Transp. on H.B. 2461, 47th Leg., 1st Reg. Sess. (Feb. 10, 2005). ADOT representatives explained that "since the statutes have been enacted, it has been ADOT's position that all offsite electronic variable message signs were prohibited." *Id.* ADOT supported the bill because it would "provide[] a tool for ADOT to establish a baseline at six-second intervals, and to actually regulate these signs and recover permit fees." *Id.*

**24.** We also note that the legislature did amend different provisions of the AHBA in 2005, adding an expanded definition of on-premises signage that would include a "comprehensive commercial development." 2005 Ariz. Sess. Laws, ch. 157, § 2 (1st Reg. Sess.) (codified at A.R.S. § 28–7902(A)(2)). But the amendment also provided that the expanded use would be applicable only insofar as it "does not cause a reduction of federal aid highway monies pursuant to 23 United States Code section 131." *Id.*

ness controls, limitations on proximity to other digital billboards, and default settings in case of a malfunction. 17 Del. C. § 1110(b)(3)(e) (2010). The Iowa Administrative Code provides that "[n]o off-premises sign shall include any flashing, intermittent or moving light or lights," but specifically exempts digital billboards so long as they comply with certain restrictions, such as a fixed message time and transition time. Iowa Admin. Code r.761–117.3(1)(e)(1–3) (2010). Similarly, the Texas Department of Transportation adopted a formal rule stating "the use of an electronic image on a digital display device is not the use of a flashing, intermittent, or moving light." 43 Tex. Admin. Code § 21.252 (2011). The rule also requires a minimum display time of eight seconds, a maximum transition time of two seconds, a default setting in case of malfunction, and brightness controls. *Id.* § 21.257.[25]

¶ 51 A failed effort by South Dakota is also relevant here. *See Volpe*, 353 F.Supp. at 341. In *Volpe*, South Dakota sued the United States Secretary of Transportation seeking to compel the Secretary to pay $3 million that was withheld from federal highway funds, representing a ten-percent reduction of the funds based on South Dakota's failure to comply with the FHBA. *Id.* at 337. The Secretary had determined that South Dakota had failed to adopt an acceptable statute that effectively controlled outdoor advertising. *Id.*

¶ 52 One of South Dakota's contentions was that the Secretary had acted arbitrarily and unreasonably in not accepting the state's determination of "customary use" with regard to size, lighting, and spacing requirements. *Id.* at 341. The court rejected the argument, explaining that the Secretary was "[c]harged with administering the Act and preserving the stated purpose from the caprice of the individual states, [and that] the Secretary established these generally accept-

ed criteria as a floor to acceptable alternatives." *Id.* The court found that South Dakota's provisions were unacceptable and agreed with the Secretary that they did not meet the minimum national standards. *Id.*

¶ 53 There is no contention here that Arizona has failed to adopt an acceptable statute effectively controlling outdoor advertising. Arizona has done so, and its beautification act, including the prohibition of intermittent lighting, has been in place since 1970. Intermittent lighting has not become exempt from the statutory prohibition merely because of technology that now allows a myriad of lighting options that were unavailable in 1970. American Outdoor's principal argument relies on the notion that changing the light display no more than every eight seconds is a reasonable determination of what should be defined as intermittent and what should not. That may well be the case; however, neither the AHBA nor the Agreement includes an exception for "limited" intermittence, and it is not our function to re-write the statute to allow one. Stated differently, it is neither our responsibility nor our prerogative to determine that a light display changing every seven seconds uses intermittent lighting while one changing every eight seconds does not. Instead, those functions lie squarely with the legislature, and to the extent permitted by the AHBA, by delegation with the director of ADOT. *See* A.R.S. § 28–7908(A) ("The director shall adopt and enforce rules governing the placing, maintenance and removal of outdoor advertising.")[26] Furthermore, allowing for public input through legislative amendment and/or formal rulemaking procedures is sound public policy. *See Winsor v. Glasswerks PHX, L.L.C.*, 204 Ariz. 303, 310, ¶ 24, 63 P.3d 1040, 1047 (App.2003) (some policy issues are "best handled by legislatures with their comprehensive ma-

---

**25.** For additional examples, *see, e.g.,* Fla. Admin. Code Ann. r.14–10.004(3)(2010) (allowing changeable message signs subject to restrictions, including minimum display time and maximum transition time); Idaho Admin. Code r.39.03.60.300.05 (2011) (same); Ala. Admin. Code r.450–10–1–.13 (2011) (same); Kan. Stat. Ann. § 68–2234(e) (2010) (same); Ohio Admin. Code 5501:2–2–02(B) (2010) (same); Mich.

Comp. Laws Ann. § 252.318(f) (2011) (same); N.J. Admin.Code 16:41C–8.8(a) (2011) (same).

**26.** ADOT has adopted various rules relating to outdoor advertising control, including definitions of some "specialized terms," but has not defined "intermittent." *See* Ariz. Admin. Code R17–3–701(A).

chinery for public input and debate").[27]

¶ 54 In sum, the conclusion we reach here is consistent with the AHBA, the Agreement, and the FHBA. We emphasize that we are interpreting the law as it has existed for over forty years. Our decision confirms that neither the legislature nor ADOT has formally addressed the effects of substantial technological changes relating to the operation and use of off-premises outdoor advertising displays. Because we hold that a digital billboard uses intermittent lighting and is therefore prohibited by the AHBA, the use permit was granted in violation of state law and is therefore invalid.[28]

## CONCLUSION

¶ 55 We hold that Scenic has standing to challenge the Board's decision granting American Outdoor's application for a use permit to operate an electronic billboard. We also hold that the Board acted in excess of its authority in granting the permit because the billboard's lighting violates the Arizona Highway Beautification Act. We therefore remand for entry of judgment in favor of Scenic.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge, and MARGARET H. DOWNIE, Judge.

---

27. As a further indication that technological advances in the billboard industry relating to electronic billboards, as well as the economic implications of such changes, have not been fully addressed by ADOT or the legislature, we note that the fee currently charged by ADOT for a billboard permit is a one-time payment of twenty dollars. *See* Permit Application, http://www.azdot.gov/highways/MaintPermits/PDF/Application.pdf (last visited Oct. 20, 2011). By contrast, the City of Tolleson currently charges a $3,000 per month permit fee for a digital billboard. Tolleson City Zoning Ordinance § 12–4–132(H)(6). ("If a use permit for digital billboard is approved, such approval is subject to a monthly 'Off–Premise[s] Sign Advertising Permit Fee' in the amount of $3,000 per month, payable to the City of Tolleson.").

28. Based on this resolution, we need not address Scenic's contention that the Board failed to make required findings of fact. *See Yuma County v. Tongeland,* 15 Ariz.App. 237, 238, 488 P.2d 51, 52 (1971) (not addressing parties' arguments concerning findings of fact when the decision was based on other reversible error).