IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**DAVID WELCH, INDIVIDUALLY AND ON BEHALF OF ALL CITIZENS OF COCHISE COUNTY, PRECINCT FIVE,**
*Petitioner/Appellant,*

*v.*

**COCHISE COUNTY BOARD OF SUPERVISORS, PATRICK G. CALL, ANN ENGLISH, AND PEGGY JUDD,**
*Respondents/Appellees.*

No. CV-20-0322-PR
Filed September 2, 2021

———————

Appeal from the Superior Court in Cochise County
The Honorable Monica L. Stauffer, Presiding Judge
No. S0200CV201900060
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
250 Ariz. 186 (App. 2020)
**AFFIRMED IN PART; VACATED IN PART**

———————

COUNSEL:

David L. Abney (argued), Ahwatukee Legal Office, P.C., Phoenix; and D. Christopher Russell, The Russell's Law Firm, PLC, Sierra Vista, Attorneys for David Welch

James M. Jellison (argued), Jellison Law Offices, P.L.L.C., Carefree, Attorneys for Cochise County Board of Supervisors, Patrick G. Call, Ann English, and Peggy Judd

Mark Brnovich, Arizona Attorney General, Joseph A. Kanefield, Chief Deputy and Chief of Staff, Brunn "Beau" W. Roysden, III, Solicitor General, Michael S. Catlett (argued), Deputy Solicitor General, Katherine H. Jessen, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

Nicholas D. Acedo, Struck Love Bojanowski & Acedo PLC, Chandler, Attorneys for Amici Curiae Arizona Counties Insurance Pool, The County Supervisors Association of Arizona, and The Arizona School Risk Retention Trust, Inc.

_____

CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in which VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY, and JUDGE BAILEY joined.*

_____

CHIEF JUSTICE BRUTINEL, opinion of the Court:

**¶1**        Arizona's open-meeting and conflict-of-interest (collectively, "public accountability") laws grant "[a]ny person affected by" either "an alleged violation" or "a decision of a public agency" standing to enforce their respective requirements.  A.R.S. §§ 38-431.07(A), -506(B).  We hold that these provisions broadly confer standing based upon a claimant's interest in preserving the values of transparency and accountability that these laws enshrine, not because of a claimant's equitable ownership of tax revenues.

**¶2**        The open-meeting law also provides that "[a]ll legal action" taken in violation thereof is "null and void" unless the public body later takes the proper steps to "ratify" that action.  A.R.S. § 38-431.05(A)–(B).  We hold that ratification only validates the initially void action; it does not moot an open-meeting claim based upon the underlying violation.

**¶3**        Accordingly, we vacate those portions of the court of appeals' opinion analyzing the laws' enforcement provisions through the lens of taxpayer standing, affirm its reversal of the trial court, and remand to the trial court for further proceedings.

## I.        BACKGROUND

**¶4**        It all started with a judicial vacancy.   Following the resignation of the Justice of the Peace for Justice Precinct Five, the Cochise County Board of Supervisors posted a public notice for a special meeting to

_____

* Due to the retirement of Justice Andrew W. Gould, pursuant to article 6, section 3 of the Arizona Constitution, Judge Cynthia J. Bailey, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

decide on a selection process and to fill the vacancy. The agenda also included notice of a possible executive session.

¶5          During the meeting, the Board considered application and committee-driven appointment processes but eventually opted for a direct appointment. The Board then went into executive session, returned after half an hour, and voted 3–0 to table the matter and recess until later that morning. The Board did not reconvene, however, until the afternoon, nearly an hour after the noticed time. Supervisor Ann English immediately moved to appoint Supervisor Patrick Call to fill the vacancy, and the Board appointed Call as Justice of the Peace by a 2–0 vote, with Call abstaining.

¶6          Two days later, David Welch, a Precinct Five resident and taxpayer, brought a special action challenging Call's appointment as a violation of Arizona's public accountability laws. *See* A.R.S. §§ 38-431.01 to -431.09, -503. The Board responded ten days later by noticing a meeting to ratify Call's appointment, *see* § 38-431.05(B), to which Welch responded the next day by securing a temporary restraining order ("TRO") enjoining the Board from proceeding with Call's appointment. Nonetheless, Call was sworn in later that day.

¶7          Shortly after Welch amended his complaint to seek additional relief, including the removal of the Board's entire membership from office, the case was reassigned to a different judge[1] who vacated the TRO and denied Welch's motion for further injunctive relief. In the meantime, the Board noticed and held a ratification meeting and voted 2–0 to ratify Call's appointment.

¶8          The trial court subsequently dismissed Welch's amended complaint. Most relevant here, the court found Welch lacked standing to enforce Arizona's public accountability laws. Additionally, the court determined that the Board's ratification of Call's appointment had cured any open-meeting violation, thereby mooting Welch's corresponding claim. Welch appealed.

¶9          The court of appeals reversed, holding that Welch's status as a Precinct Five resident and taxpayer made him a "person affected by" expenditures made in violation of Arizona's public accountability laws, *see* §§ 38-431.07(A), -506(B), and thus gave him standing to enforce them here, *Welch v. Cochise Cnty. Bd. of Supervisors*, 250 Ariz. 186, 192 ¶¶ 13–15 (App. 2020). Those expenses included the salary paid to a justice of the peace. In

---

[1] The judge that issued the TRO recused herself after sending an email to a colleague criticizing Call's appointment.

that court's view, a taxpayer's interest rests not in the initial decision to spend taxpayer dollars, but in the legality of those funds' expenditure and the value they reap. *Id.* at 193 ¶¶ 16–17. Nor did the court find Welch's open-meeting claim moot. Although the Board's decision to ratify Call's appointment had ensured its effectiveness against a charge that the original appointment was null and void, sanctions for the original violation remained available. *Id.* at 195 ¶ 25 (citing §§ 38-431.05, -431.07(A)). This petition followed.[2]

**¶10** We granted review to clarify private claimants' standing to challenge alleged violations of Arizona's public accountability laws and to decide what effect statutory ratification has on a private claimant's open-meeting claim. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II. DISCUSSION

**¶11** The parties' dispute boils down to whether taxpayer standing suffices to enforce Arizona's public accountability laws and whether statutory ratification moots an open-meeting claim. We review such legal questions de novo. *State v. Hansen*, 215 Ariz. 287, 289 ¶ 6 (2007). As ever, our aim in statutory interpretation is "to effectuate the legislature's intent." *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). Absent ambiguity or absurdity, our inquiry begins and ends with the plain meaning of the legislature's chosen words, read within the "overall statutory context." *Rosas v. Ariz. Dep't of Econ. Sec.*, 249 Ariz. 26, 28 ¶ 13 (2020). Otherwise, we turn to "secondary" factors, such as subject matter, history, purpose, and consequences. *Id.*

### A. Standing

**¶12** The Arizona Constitution omits a "case or controversy" requirement akin to the one contained in its federal counterpart. *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 209 ¶ 8 (2019). For this reason, we are "not constitutionally constrained to decline jurisdiction based on lack of standing." *Id.* Still, Arizona courts do "exercise restraint to ensure they 'refrain from issuing advisory opinions, that cases be ripe for decision

---

[2] We do not disturb the court of appeals' decision regarding the availability of removal from office as a remedy for violating Arizona's public accountability laws, the sufficiency of Welch's allegations supporting his claims (which we presume in his favor anyway), the legal legitimacy of the Board's ratification of Call's appointment, or the disclosure of the Board's executive session minutes.

and not moot, and that issues be fully developed between true adversaries.'" *Id.* (quoting *Bennett v. Brownlow*, 211 Ariz. 193, 196 ¶ 16 (2005)). Standing may be conferred by a statute. *See id.* at 209–10 ¶ 9.

**¶13** Both the open-meeting and the conflict-of-interest law contain similarly worded enforcement provisions that confer standing. "Any person affected by" either "an alleged violation" of the open-meeting law, § 38-431.07(A), or "a decision of a public agency," § 38-506(B), has standing to file suit. Though the scope of suitable claimants under each depends upon a distinct event—for the open-meeting law, its violation; for the conflict-of-interest law, a decision—we, like the court of appeals, see "no principled reason" to adopt dissimilar meanings for their common terminology. *See Welch*, 250 Ariz. at 192 ¶ 15; *accord Qasimyar v. Maricopa County*, 250 Ariz. 580, 587 ¶ 19 (App. 2021) ("[A] word or phrase used in related statutes should be construed to bear the same meaning throughout."). Accordingly, we construe the use of the phrase "[a]ny person affected by" uniformly.[3]

**¶14** No doubt, "any person" includes Welch. *See Person*, Black's Law Dictionary (11th ed. 2019) ("A human being."). The only question, then, is whether the Call appointment's impact on Welch's status as a Precinct Five resident and taxpayer permits us to conclude that he was "affected by" the Board's actions. We find that it does not.

**¶15** Neither law defines "affected by," and dictionaries circularly define "affect" as meaning "to produce an effect on" or "to influence in some way." *Affect*, Black's Law Dictionary (11th ed. 2019); *accord Affect*, Merriam-Webster, https://www.merriam-webster.com/dictionary/affect (last visited Aug. 31, 2021); *see also State v. Pena*, 235 Ariz. 277, 279 ¶ 6 (2014) ("Absent statutory definitions, courts apply common meanings and may look to dictionaries." (internal citations omitted)). Such breadth plausibly encompasses any articulable relationship. But such a broad definition would invite absurd results. Indeed, to define "affected by" without any concrete limitation would be to ignore its limiting role. The practical result would be a grant of standing to "any person," thereby reducing the legislature's presumably intentional inclusion of "affected by" to mere

---

[3] We note that standing to enforce one law will not always mean standing to enforce the other. Even with a uniform reading of "any person affected by," standing under each law depends upon its own triggering event. For purposes of this opinion, however, we presume Call's appointment is both "an alleged violation" of the open-meeting law and a "decision of [the Board]" under the conflict-of-interest law. *See* §§ 38-431.07(A), -506(B).

surplusage.  *See Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019) ("A cardinal principle of statutory interpretation is to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous.").  We therefore must employ other interpretive tools.  *Ariz. Dep't of Water Res. v. McClellan*, 238 Ariz. 371, 375 ¶ 24 (2015).

**¶16**		The court of appeals attempted to limit this language by reading each law's enforcement provision as a grant of taxpayer standing. The court found that Welch's ultimate responsibility to replenish misappropriated funds as a Precinct Five resident and taxpayer gave him an "interest in receiving good value" for all Board tax expenditures, including those spent on Call's justice of the peace salary.  *Welch*, 250 Ariz. at 193 ¶¶ 16–17.  The court then distinguished Welch's situation from that in *Dail v. City of Phoenix*, wherein the court found the claimant's taxpayer status inadequate to challenge a city contract to construct a water and sewer system.  128 Ariz. 199, 201–02 (App. 1980).  The relevant statute there gave standing to "[a]ny person . . . whose rights . . . are affected by a . . . contract."  A.R.S. § 12-1832.  But the contract's funding had come from city water revenues, not taxes.  *Dail*, 128 Ariz. at 202.  Conversely, here, local tax dollars fund justice of the peace salaries.  Thus, the court of appeals found that Welch's interest in those expenditures includes the assurance of the Board's compliance with state public accountability laws, "even if the purpose of the expenditure is proper."  *Welch*, 250 Ariz. at 193 ¶ 16.  We disagree.

**¶17**		We can appreciate the logical allure of the approach below. The court of appeals has long considered a challenged action's funding source in assessing whether a claimant's taxpayer status suffices for standing.  *See, e.g.*, *Tucson Cmty. Dev. & Design Ctr., Inc. v. City of Tucson*, 131 Ariz. 454, 456 (App. 1981) ("Since there has been no expenditure of funds raised by taxation and no pecuniary loss to the city, the mere status of resident taxpayer is insufficient to confer standing.").  And, unlike the contract awarded in *Dail*, "an expenditure of funds generated through taxation" does pay for Call's justice of the peace salary.  *See* 128 Ariz. at 203. Yet a test focused on finding a taxpayer-financed funding source proves meaningless here.  Indeed, it is difficult to imagine a government action lacking at least some impact on taxpayer funds.  For instance, in *Dail*, the city employees tasked with negotiating the water project contract surely drew public salaries.  But those incidental costs were held not to suffice for standing.  *See id.* at 202 (requiring "a direct expenditure of funds that were generated through taxation, an increased levy of tax, or a pecuniary loss attributable to the challenged transaction of a municipality").  Nor are they enough here.

¶18 We have long observed the "almost universal rule" that taxpayers generally may enjoin the illegal expenditure of taxpayer dollars. *Ethington v. Wright*, 66 Ariz. 382, 386 (1948); *accord Rodgers v. Huckelberry*, 247 Ariz. 426, 429–30 ¶¶ 11–14 (App. 2019) ("[A]n allegation of an illegal expenditure has generally been held sufficient to establish standing."). However, we have never counted preexisting, incidental payroll costs as such an expenditure. *See Henderson v. McCormick*, 70 Ariz. 19, 24–25 (1950) (taxpayer status insufficient to challenge illegal sale of town-owned vehicle); *cf. Ethington*, 66 Ariz. at 387 (taxpayer status enough to challenge expenditure of illegally levied tax revenues). Nor, until now, has the court of appeals. *See Blanchard v. Show Low Plan. & Zoning Comm'n*, 196 Ariz. 114, 117 ¶ 15 (App. 1999) (homeowners' taxpayer status insufficient to challenge rezoning of nearby parcel); *Tucson Cmty. Dev. & Design Ctr.*, 131 Ariz. at 458 (no taxpayer standing to challenge city use of block grant funds just because "regular city employees have performed services in furtherance of the project"); *Dail*, 128 Ariz. at 202–03 (no standing to challenge contract for separately funded project); *cf. Rodgers*, 247 Ariz. at 429–30 ¶¶ 11–14 (taxpayer standing to challenge illegally awarded contract funded by tax revenues arising from "equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misappropriation" (quoting *Ethington*, 66 Ariz. at 386)); *Smith v. Graham Cnty. Cmty. Coll. Dist.*, 123 Ariz. 431, 432–33 (App. 1979) (same); *Secrist v. Diedrich*, 6 Ariz. App. 102, 104 (1967) (standing for illegal expenditures). We hold to that view today.

¶19 The relationship between the Board's decision to appoint Call and his compensation is too remote to support taxpayer standing. A justice of the peace salary, even one paid to a legally dubious nominee, is generally only incidental to his or her appointment. Call's appointment is not responsible for his salary's existence or for the tax levy that funds it. *See Tucson Cmty. Dev. & Design Ctr.*, 131 Ariz. at 458. Nothing in this record suggests the Board created a new justice of the peace position, increased the post's compensation, or otherwise added to taxpayers' liabilities to accommodate their former colleague. The Board appointed Call to a preexisting position, which was paid a preexisting salary, which was funded by a preexisting tax levy.

¶20 Call's salary also bears no relevance to Welch's requested relief. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976) ("[T]he relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision."). A court order restoring those funds to county coffers would not redress the injury of Call's allegedly unlawful appointment. Nor would removing Call from his

post in any way keep those already-appropriated funds from being used to pay the seat's eventual occupant. It was error, then, to credit Welch's status as a taxpayer to grant him standing here.

¶21 We further find taxpayer standing itself to be ill-suited to the enforcement of Arizona's public accountability laws. Public bodies frequently make decisions that lack any budgetary impact. Filling an existing judicial vacancy is but one example. Yet an absence of expenditures hardly exempts these decisions from the same transparency and impartiality requirements that govern new appropriations. *See* §§ 38-431.01, -503. And a claim of someone "affected by" such a decision is no less justiciable. *See* §§ 38-431.07(A), -506(B). Given its preoccupation with expenditures and their funding sources, taxpayer standing fails to account for these claimants and, thus, proves a poor lens through which to view standing here.

¶22 The cases relied on by the court of appeals underscore this incompatibility. In each instance, taxpayer standing acted as a check on potential claims. *See Rodgers*, 247 Ariz. at 429–30 ¶¶ 12–13 (claimant must show expenditure of tax-generated funds or pecuniary loss); *Tucson Cmty. Dev. & Design Ctr.*, 131 Ariz. at 456 (same); *Dail*, 128 Ariz. at 203 (same); *Smith*, 123 Ariz. at 433 (same); *Secrist*, 6 Ariz. App. at 104 (same). *Dail* illustrates an appropriate use of taxpayer standing. The court there used taxpayer standing to reject the argument that a claimant's taxpayer status alone gave him automatic standing to challenge a city contract. *Dail*, 128 Ariz. at 201. To be sure, Arizona law grants claimants a broad "remedial" right to seek declaratory relief regarding the "construction or validity" of such contracts. A.R.S. §§ 12-1832, -1842. But "only if [the claimant] is 'interested under' the contract or [the claimant's] 'rights, status or legal relations are affected by' the contract." *Dail*, 128 Ariz. at 201 (quoting § 12-1832). In cases involving the meaning or validity of statutes, ordinances, or contracts, that interest or effect will often, though not always, depend upon the claimant's interest in a resulting tax levy or expenditure. *See id.* at 201–02; *cf. United Food & Com. Workers Loc. 99 v. Bennett*, 934 F. Supp. 2d 1167, 1188–89 (D. Ariz. 2013) (labor union had standing to seek declaratory relief from law regulating labor and employment). Taxpayer standing thus serves to ensure claimants in such cases have "some interest beyond a general desire to enforce the law." *See Dail*, 128 Ariz. at 202. Not so of cases enforcing state public accountability laws. Applying the same test would, by default, exclude a class of claimants for whom the statutory text plainly provides relief. The court of appeals erred in adopting this test below.

**¶23**        As for an appropriate test, we do not write on a blank slate. In *City of Scottsdale v. McDowell Mountain Irrigation & Drainage District*, we construed a statute allowing "any person affected [by]" a county board decision organizing an irrigation district to file suit challenging that district's validity.  107 Ariz. 117, 121 (1971).  Given the statute's remedial purpose, we read its enforcement provision broadly—specifically, we asked "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute."  *Id.* (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).  Notably, there, we refused to find standing based on the individual claimant's status as a county taxpayer, finding his fear of future tax increases to fund the new district too remote and speculative.  *Id.* at 121–22.  Meanwhile, we found that the city's statutory interest in keeping a defined area of adjacent land clear for its own expansion fell within the relevant zone of interests, given the district's planned incursion into that protected area.  *Id.* at 122.

**¶24**        We conclude that the same "zone of interests" test applies here.  In addition to having almost identically worded enforcement provisions, Arizona's public accountability laws, like the *City of Scottsdale* statute, are remedial in nature.  *See id.* at 121; *see also Scenic Ariz. v. City of Phx. Bd. of Adjustment*, 228 Ariz. 419, 422 ¶ 7 (App. 2011) (analyzing statute permitting "person aggrieved" by board decision to sue for remedial relief and noting that it is to be broadly construed).  To that end, the open-meeting law instructs courts to construe its provisions "in favor of open and public meetings."  § 38-431.09(A).  We therefore read each law's enforcement provision "broadly to effectuate the legislature's purpose in enacting them."  *In re Estate of Winn*, 214 Ariz. 149, 150 ¶ 5 (2007).  We address Welch's standing to enforce each of them in turn.

### 1.    *The Open-Meeting Law*

**¶25**        Welch's interests as a Cochise County resident fall within the zone of interests protected by the open-meeting law.  *See City of Scottsdale*, 107 Ariz. at 121.  The legislature enacted the law "to open the conduct of the business of government to the scrutiny of the public and to ban decision-making in secret."  *Karol v. Bd. of Educ. Trs.*, 122 Ariz. 95, 97 (1979).  It further declared that government proceedings "exist to aid in the conduct of the people's business."  1962 Ariz. Sess. Laws ch. 138, § 1 (2d Reg. Sess.).  As one such person and, more specifically, as one of the Board's constituents, Welch has an interest in ensuring that the Board's "official deliberations and proceedings be conducted openly."  *Id.*; *accord* § 38-431.09(A) ("It is the public policy of this state that meetings of public bodies be conducted

9

openly . . . ."); *see also* § 38-431.01(A) ("[A]ll persons so desiring shall be permitted to attend and listen to the deliberations and proceedings."). The Board's alleged violation of the open-meeting law in appointing Call "affected" that interest. *See* § 38-431.07(A).

¶26 Our interpretation's recognition of a large class of claimants under the open-meeting law does not cause us to question its soundness. We rejected use of taxpayer standing precisely for its underinclusiveness. *Supra* ¶¶ 19–20. The law's remedial purpose favors a more inclusive reading. *See* § 38-431.09(A); *Winn*, 214 Ariz. at 150.

¶27 We are equally unmoved by Welch's failure to personally attend (or try to attend) the meeting that preceded Call's appointment. Welch's interest in the Board's adherence to its open-meeting obligations does not require his presence. As the court of appeals observed, any hindrance to public access—most notably, for the press and other watchdogs, upon which constituents like Welch regularly rely to keep abreast of government operations—affects those to whom such access is guaranteed. *See Welch*, 250 Ariz. at 192 ¶ 14 & n.2. We agree with that assessment.

¶28 The out-of-state decisions relied on by the Board are no more availing. In *Arnold v. City of Stanley*, the court construed near-identical language in the Idaho open-meeting law to deny standing to claimants seeking to nullify an ordinance adopted at a meeting that had started half an hour ahead of schedule. 345 P.3d 1008, 1009–10 (Idaho 2015); *see* Idaho Code § 74-208(6) ("Any person affected by a violation of [the open-meeting law] . . . .").[4] But it did so for reasons inapplicable here. Despite the meeting's early start time, the notice had accurately stated the meeting's agenda, and the claimants there had already prearranged to have their written testimony read into the record in lieu of offering live testimony. *Arnold*, 345 P.3d at 1009–10. The court held that, although the ordinance adopted at the meeting presumably affected the claimants' property rights, the open-meeting law's "violation" had not secured its passage. *Id.* at 1012–13. This issue does not preclude Welch's standing here. Under the "zone of interests" test, the impact of the Board's alleged secrecy on Welch's interest in open-government deliberations is enough. *See City of Scottsdale*, 107 Ariz. at 121; *see also Welch*, 250 Ariz. at 192 ¶ 14 (refusing *Arnold*'s

---

[4] At the time *Arnold* was decided, the same enforcement provision was codified at Idaho Code § 67-2347(6). *See* 345 P.3d at 222.

"narrow" construction given statutory directive to construe Arizona's open-meeting law broadly).

**¶29**        We also note the secrecy shrouding Call's appointment. *Cf. Arnold*, 345 P.3d at 1012 ("[T]he circumstances under which the meetings were held in this case do not indicate secrecy."). The apparent brevity of the Board's initial meeting, the unknown discussions during executive session, the unexplained hour-long delay in reconvening, and the surprise nomination of a sitting supervisor together raise the specter of secrecy in a manner not analogous to simply starting a meeting half an hour earlier than originally noticed. *Cf. id.*

**¶30**        The Board's reliance on *Severson v. City of Burlington* fares no better. *See* 215 A.3d 102 (Vt. 2019). For starters, the Vermont open-meeting law's use of "aggrieved by" entails a standard different from the "affected by" one that governs the enforcement of Arizona's open-meeting law. *See* 1 Vt. Stat. § 314(c); *see also Aggrieved*, Black's Law Dictionary (11th ed. 2019) ("(Of a person or entity) having legal rights that are adversely affected; having been harmed by an infringement of legal rights."); *Aggrieved Party*, Black's Law Dictionary (11th ed. 2019) ("A party entitled to a remedy; esp., a party whose personal, pecuniary, or property rights have been adversely affected by another person's actions or by a court's decree or judgment."). Our own legislature's use of the "aggrieved by" standard in other statutes underscore its distinctiveness. *See, e.g.*, A.R.S. § 48-2912 ("Any person aggrieved by the action of the board of supervisors . . . ."). We do not decide what those differences are today—only that the two are not synonymous.

**¶31**        Even if the standards were the same, *Severson* still poses no impediment to standing here. The court there held that the claimant, a city board member, lacked standing to enforce the state's open-meeting law on behalf of "unknown members of the public" who might have been locked out of a board meeting. *Severson*, 215 A.3d at 108–09 ¶ 19. The notice setting the meeting had warned that the doors would be locked half an hour after the meeting's start time, *id.* at 104 ¶ 3, and, aside from low attendance, the board member could only speculate that locking the doors had either denied entrance to or deterred the attendance of "at least one member of the public," *id.* at 109 ¶ 19. The court refused to indulge such an inference. *Id.* Such speculation did not, however, render the board member's underlying interest illusory—indeed, the court held that he had a "cognizable interest" in ensuring access for his constituents. *Id.* at 108 ¶ 18. The court instead found no basis to infer any harm to that interest. *Id.* at 109 ¶ 19. Welch's alleged injuries are hardly so speculative. He is not interceding on behalf of other would-be claimants. *Cf. id.*; *Arnold*, 345 P.3d

11

at 1013 (rejecting a similar attempt to sue on behalf of "all interested citizens" who "may have hypothetically been affected by the meeting's early start time"). Instead, he seeks to vindicate his own statutorily protected interest in the Board's deliberative transparency. *See City of Scottsdale*, 107 Ariz. at 121.

2. *The Conflict-of-Interest Law*

**¶32** The same result follows for Welch's conflict-of-interest claim. Although the law's enforcement depends upon a distinct trigger—namely, "a decision of a public agency," § 38-506(B)—this arguably narrower scope does not exclude Welch. Like its open-meeting counterpart, the conflict-of-interest law embodies a prophylactic policy of transparency and accountability. *See Maucher v. City of Eloy*, 145 Ariz. 335, 337–38 (App. 1985) (conflict-of-interest law adopted to protect public from official self-dealing); *see also Williams v. State ex rel. Morrison*, 83 Ariz. 34, 36 (1957) ("[I]t is imperative that [a public official] have no personal interest that might clash or conflict with that of the state."). An official with "a substantial interest" in the business before his or her agency must publicly disclose that interest and "shall refrain" from all associated decisions and deliberations. § 38-503(A)–(B). The legislature enacted the law "to remove or limit the possibility of personal influence which might bear upon an official's decision." *Yetman v. Naumann*, 16 Ariz. App. 314, 317 (1972); *accord Croaff v. Evans*, 130 Ariz. 353, 360 (App. 1981) ("[S]ound public policy supports and requires the disqualification of public officials when their private interests create a possibility of conflict with their public duties.").

**¶33** The "zone of interests" created by the conflict-of-interest law easily encompasses Welch's claim. *See City of Scottsdale*, 107 Ariz. at 121. As a Cochise County resident and Board constituent, he has an interest in protecting against self-dealing by Board members. *See Maucher*, 145 Ariz. at 337–38. Moreover, here, as a Precinct Five resident who apparently had litigation pending in that justice court at the time, Welch had a particular interest in ensuring the justice of the peace presiding over his claims was not selected through self-dealing. Meanwhile, the circumstances preceding Call's appointment plausibly imply his involvement in his own nomination. He took part in the Board's decisions to forego other candidate selection methods, to go into executive session, and to table the matter—all without publicly disclosing his interest in the position. The Board then resumed its session an hour after the appointed time and immediately

nominated and appointed Call to the post.[5]  Because the Board's decision affected Welch's statutorily protected interest in preventing self-dealing, he has standing to challenge it.  *See* § 38-506(B).

### B. Mootness

**¶34**         Welch's standing to enforce the open-meeting law in turn requires us to decide what effect, if any, the Board's ratification of Call's appointment had on that claim.  Under § 38-431.05(A), any legal action transacted by a public body in violation of the open-meeting law is "null and void" by default.  A public body can negate that consequence, however, by ratifying its violative conduct subject to certain statutory criteria.[6]  *See* § 38-431.05(B)(1)–(4).  The court of appeals interpreted this exception narrowly.  Specifically, it held that ratification "merely provides a way to ensure the effectiveness of decisions by negating the consequence that a decision at an improper meeting is null and void."  *Welch*, 250 Ariz. at 195 ¶ 25.  We agree.

**¶35**         The plain language of the statutory ratification provision all but mandates the court of appeals' interpretation.  The word "ratification" means "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done."  *Ratification*, Black's Law Dictionary (11th ed. 2019).  Hence, ratification is concerned not with the absolution of liability, but with the effectiveness of an initially invalid act.  Context and structure reinforce this reading.  The provision begins with a default rule that lists a single consequence for legal action taken in violation of the open-meeting law: nullification.  *See* § 38-431.05(A).  The immediately succeeding word "except" in turn signals an exception to that rule—and only that rule.  *See id.*; *see also Exception*, Black's Law Dictionary (11th ed. 2019) ("A provision in a statute exempting certain persons or conduct from the statute's operation.").  The statute does not mention the remedies

---

[5] The special meeting minutes further reveal that, after moving to appoint Call, Supervisor English shared that Call had long expressed an interest in the position and that she thought Call would make a good fit when she learned of the possible vacancy.

[6] Because we denied Welch's cross-petition for review of the issue, we do not address the court of appeals' conclusion that Welch waived his argument challenging the Board's compliance with the open-meeting law's ratification procedure.  *See Welch*, 250 Ariz. at 195-96 ¶¶ 28–29.

associated with enforcement actions, much less make ratification an exception to their availability.[7]  *See* § 38-431.07(A).

**¶36**            The Board's suggestion that § 38-431.05 expresses "no limitation" on ratification's effects ignores both the legislature's chosen (and unchosen) words and the statute's grammatical construction.  *See* § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language."); *accord Nicaise*, 245 Ariz. at 568 ¶ 11. The canon of construction *expressio unius est exclusio alterius*—that is, the expression of one item implies the exclusion of others—counsels us to construe the legislature's exclusion of remedies as intentional.  *See City of Surprise*, 246 Ariz. at 211 ¶ 13.   The legislature could have included a provision barring post-ratification recovery as other states have done.  *See, e.g.*, Cal. Gov. Code § 54960.1(e) (enforcement action "shall be dismissed with prejudice" if open-meeting violation "cured or corrected by a subsequent action"); 1 Vt. Stat. § 314(b)(1) ("The public body will not be liable for attorney's fees and litigation costs . . . if it cures in fact a violation [of the open-meeting law] in accordance with [§ 314(b)(4)]."); Idaho Code § 74-208(7)(d) (ratification, or "cure," "shall act as a bar to the imposition of" civil penalties).  But it did not.  And it is not our role to add one.  *Collins v. Stockwell*, 137 Ariz. 416, 420 (1983) ("Courts will not read into a statute something that is not within the manifest intent of the Legislature as gathered from the statute itself.").

**¶37**            Treating ratification as a complete cure to an open-meeting violation would also ignore the legislature's express intent that government proceedings "be conducted openly."  1962 Ariz. Sess. Laws ch. 138, § 1. Public bodies would have little incentive to hold open meetings in the first instance if they could rest assured that swift ratification upon a violation's detection would avoid all statutory sanctions.  We accordingly decline the Board's invitation to interpret the statute more broadly.

---

[7] Though his view is not dispositive, the Arizona Attorney General, whose Open Meeting Law Enforcement Team handles open-meeting inquiries, investigations, and enforcement proceedings, takes a similar position regarding ratification's effects on such claims.  *See* Arizona Attorney General, *Arizona Agency Handbook* § 7.12.1 (rev. 2018), https://www.azag.gov/sites/default/files/docs/agency-handbook/2018/agency_handbook_chapter_7.pdf ("Ratification merely validates the prior action; it does not eliminate liability of the public body or others for sanctions under the Open Meeting Law, such as civil penalties and attorney's fees.").

¶38 The cases cited by the Board likewise fail to alter our analysis. Both decisions refer to § 38-431.05 before it contained a ratification provision. *See McLeod v. Chilton*, 132 Ariz. 9, 14 (App. 1981); *Cooper v. Ariz. W. Coll. Dist. Gov. Bd.*, 125 Ariz. 463, 466–68 (App. 1980). At that time, the statute simply provided that "[a]ll business transacted by any public body during a meeting held in violation of the provisions of this article shall be null and void." 1978 Ariz. Sess. Laws ch. 86, § 5 (2d Reg. Sess.). Nevertheless, in *Cooper*, the court of appeals held that nothing in the earlier version of § 38-431.05 barred a public body from readopting an action previously rendered null and void by an initial open-meeting violation. 125 Ariz. at 468. So long as the subsequent action passed muster under the open-meeting law, "the same matter may be considered and adopted again." *Id.* at 469. This conclusion was echoed in *McLeod* the following year, *see* 132 Ariz. at 14 (permitting readoption under circumstances "not materially different from *Cooper*"), and codified by the legislature a year later, *see* 1982 Ariz. Sess. Laws ch. 278, § 5 (adding ratification exception to default rule). However, much like the ratification provision itself, both decisions stop short of saying such curative efforts bar recovery for the original violation.

¶39 We are similarly unpersuaded by the Board's suggestion that the relatively few remedies available to Welch as a private claimant means ratification should serve as a complete cure to such claims. *See* § 38-431.07(A). The Board offers no authority for its apparent view that an open-meeting claim's continued validity post-ratification requires not just an available remedy, but a sufficiently substantial one. We likewise see no principled basis for such a rule. No matter the identity of the claimant, an open-meeting violation remains actionable even after the underlying decision's ratification. *See* § 38-431.05(A). Once more, we refuse to read into the statute a limitation that is not there.

¶40 We are nevertheless mindful of the lingering uncertainty as to the remedies still available to Welch. Section 38-431.07(A)'s reference to "a successful plaintiff" plainly encompasses Welch—that is, provided he prevails on his open-meeting claim. *See Plaintiff*, Black's Law Dictionary (11th ed. 2019) ("The party who brings a civil suit in a court of law."). At a minimum, then, a successful Welch would be eligible to recover his legal fees. *See* § 38-431.07(A). Whether he would be entitled to equitable relief presents a closer question. The court of appeals left open the possibility for both mandamus and injunctive relief if the trial court finds an open-meeting violation. *See Welch*, 250 Ariz. at 196-97 ¶ 34. Indeed, the relevant statutory provisions tend to support the availability of these remedies. *See* §§ 38-431.04 ("Where the provisions of this article are not complied with, a

15

court of competent jurisdiction may issue a writ of mandamus requiring that a meeting be open to the public."), -431.07(A) (permitting suits "for the purpose of requiring compliance with, or the prevention of violations of" the open-meeting law). We need not resolve that issue today. Given the still-early stage of these proceedings, we can only guess whether Welch will prevail on his open-meeting claim, much less whether the circumstances will warrant equitable relief. We accordingly leave the question of appropriate remedies to the trial court to resolve in the first instance.

### III.     CONCLUSION

¶41          Today's opinion does not announce a new standard for garden-variety standing questions. In adopting Arizona's public accountability laws, the legislature made clear its desire that their provisions be broadly enforceable by all having an interest in the transparency and accountability of those public agencies and officials that act on their behalf. These interests exist independently of one's active involvement in or attendance of government meetings, and they are affected even when there is nobody there to witness their violation. It is for these reasons that we hold that §§ 38-431.07(A) and -506(B) grant standing to all who fall within the broader "zone of interests" protected by Arizona's public accountability laws. We further hold that ratification under § 38-431.05(B) does not act as a complete cure to an open-meeting violation; instead, it merely negates the original action's default nullification. We therefore vacate paragraphs 11 through 17 of the court of appeals' opinion, affirm its reversal of the trial court, and remand to the trial court for further proceedings.